**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

COALITION TO PROTECT COWLES            )
BOG AREA, TERRY GRIMM,                  )
ROBERT EVANS, CHERYL EVANS,             )
                                        )
      Plaintiffs,                      )
                                        )         2:12-CV-515
    v.                                  )
                                        )
KENNETH SALAZAR, in his official capacity )
as the United States Secretary of the Interior; )
CONSTANTINE DILLON, in his official      )
capacity as Superintendent of the Indiana Dunes )
National Lakeshore for the National Park Service; )
DAN MASON, in his official capacity as Botanist )
for the National Park Service; UNITED STATES )
DEPARTMENT OF THE INTERIOR;             )
NATIONAL PARK SERVICES,                  )
                                        )
      Defendants.                      )

## OPINION and ORDER

      The Indiana Dunes National Lakeshore stretches along the southern edge of Lake

Michigan for approximately 25 miles.  It's a patchwork of land that looks something like a

gerrymandered voting district.  At about the midway point of this expanse is Cowles Bog, a

wetland area that today has significant tree growth.  The National Park Service, through the

Secretary of the Interior, initiated a project to restore a portion of Cowles Bog back to a wetland

by cutting down approximately 3,400 trees.  After a lengthy approval process, the project began

at the end of 2012.  A group of residents from an adjacent neighborhood, however, have cried

foul, believing that the project violates the National Environmental Policy Act ("NEPA") and the

Administrative Procedure Act ("APA").  The residents filed this lawsuit in an attempt to halt the

destruction of the trees.  Both sides have now moved for summary judgment.  For the reasons

explained in detail below, Plaintiffs' Motion for Summary Judgment will be **DENIED** and

Defendants' Motion for Summary Judgment will be **GRANTED**.

**Factual and Legal Background**

The central conceit of the Plaintiffs' challenge here is that the Park Service failed to

comply with NEPA's requirement when it reached its decision to cut down 3,400 trees in order

to restore Cowles Bog to a wet-mesic prairie. Before reviewing what the Park Service actually

did in this case, let me quickly sketch out the procedures that NEPA generally requires when a

federal agency wants to undertake an action like this.

When a federal agency elects to pursue any major action that might significantly affect

the environment – like, say, cutting down 3,400 trees – it must comply with NEPA. One of the

things NEPA requires is the preparation of an Environmental Assessment ("EA"), which is a

"concise public document . . . that . . . [b]riefly provide[s] sufficient evidence and analysis for

determining whether to prepare an environmental impact statement or a finding of no significant

impact." 40 C.F.R. § 1508.9(a). The purpose of an EA "is to determine whether there is enough

likelihood of significant environmental consequences to justify the time and expense of

preparing an environmental impact statement [EIS]." *River Rd. Alliance v. Corps of Eng. of U.S.

Army,* 764 F.2d 445, 449 (7th Cir. 1985). The EA thus ultimately results in one of two findings:

1) a finding that an EIS is required, in which case additional time and expense will be incurred,

or 2) a finding of no significant impact, which is commonly referred to as a "FONSI." *Rhodes v.

Johnson*, 153 F.3d 785, 788 (7th Cir. 1998). If the agency issues a FONSI, then the project may

proceed as planned without performing the more comprehensive EIS and without further inquiry.

*See* 40 C.F.R. § 1501.4(e).

Here's how the process unfolded in this case.  The Indiana Dunes National Lakeshore was established in 1966 when Congress passed the "Lakeshore Act."  *See* 16 U.S.C. §§ 460u, *et seq.*  Around ten years ago, the Park Service started conducting investigations into the Cowles Bog Wetland Complex to establish what it would have looked like in the absence of human interference (settlers came to the area early in the 19th Century).   The Park Service has established a policy that aims to restore park resources in this way.  *See* Management Policies § 4.1, found at http://www.nps.gov/policy/MP2006.pdf.

In the context of this investigation, Park Service scientists took 39 soil samples, which contain ecological fingerprints of what the land used to look like.  As noted above, the area is now heavily wooded (thus the 3,400 trees at issue here), but the soil samples "documented an unusual micro-topographical complex of nine soil types that developed under conditions of wet-mesic prairie with a few scattered trees."  [R. 1323, 1367-68.]  A very lengthy and detailed scientific report documenting these soil samples was prepared for the Park Service by various botanists, ecologists, and chemists, including Defendant Dan Mason, a Department of Interior botanist, and Dr. Noel Pavlovic.  [R. 1059-1311.]   As part of their review, Mason and Pavlovic went to the site to better evaluate a federal land survey of the area from 1830.  Based on that visit, Pavlovic concluded that these "presettlement records" (the 1830 survey) showed that the area under consideration for restoration had been a marsh.  [R. 16-18.]  The Park Service thus concluded, based on the extensive samples, the 1830 land survey, and a comparison of ariel photography from the 1930s onward, that the area had originally been a wetland with minimal tree cover.

With this information in hand, the Park Service decided to undertake the process of

3

restoring the area to a wet-mesic prairie.  First, on July 20, 2011, the Park Service convened an

"Agency Coordination Meeting" with various state and federal agencies regarding the

preparation of an EA.  [R. 187-97.]  This meeting included a site visit to Cowles Bog and various

presentations regarding the ecological history of area.  [*Id.*]  Later that evening the Park Service

also held a "Public Input Meeting."  [*Id.*]  Presentations were again made about the history of the

area and also about the various plans under consideration, and attendees then asked numerous

questions about the project.  [*Id.*]

Some nine months later, on March 9, 2012, the Park Service issued the EA for comment.

The EA plainly states that "[t]he purpose of the proposed action is to restore approximately 25

acres of [the Cowles Bog Wetland Complex] to its former lake plain wet-mesic prairie

conditions and provide waterfowl habitat in an adjacent open water body."  [R. 328.]

After describing the history of the area, the EA goes on to consider a "range of

alternatives to provide a lake plain wet-mesic prairie [that] were developed and evaluated

throughout the development of [the] environment assessment."  [R. 341.]   The EA analyzed

three proposals to achieve this goal: (1) the no-action alternative (which is required by the

regulations governing NEPA), (2) the preferred alternative, which retained selected trees, and (3)

an alternative that would have retained trees only near a historic home site in the project area.

[R. 341–75.]  Each of these alternatives were analyzed for their impact on various topics like

geology and soils, vegetation, wildlife, threatened and endangered species, water quality, and

wetlands.  [*Id.*]  The EA also analyzed the cumulative impacts of the preferred alternative and

the no-action alternative with other past, present, and reasonably foreseeable future actions.  [*Id.*]

 The EA concluded that for each of the impact topics, the preferred alternative would not have a

4

significant impact on the human environment.  [*Id.*]

In addition, the EA also addressed two alternatives that "were considered and dismissed because they did not meet the project's purpose."  [R. 341.]  The two alternatives that were considered but dismissed would have retained trees over either 40 cm in diameter at breast height or 70 cm at breast height.  The EA concluded that neither of these options would "reduce the tree canopy enough to support desired species and would not provide a buffer to Mineral Springs Road.  Therefore, neither of these options would meet the project's Purpose and Need." [R. 348.]

After issuing the EA for public comment on March 9, 2012, the Park Service took the additional step of presenting it to the Town of Dune Acres on March 31, 2012 and leading residents on a site visit of the project area.  [R. 987.]  The public comment period on the draft EA closed on April 9, 2012.  [R. 628.]  The Park Service received 74 written comments, of which 35 supported the project and 39 expressed concern about it.  [R. 630 - 746]  The Park Service provided detailed and lengthy responses in writing to each of the 39 comments that expressed concern.  [R. 1318 - 1378.]  On November 5, 2012, the Superintendent of the Lakeshore signed a recommendation of a FONSI for submission to the Regional Director for approval. [R. 988.]  On November 13, 2012, the Midwest Regional Director of the Park Service approved both the response to the comments that were received and the FONSI, and signed the FONSI as approved. [*Id.*]  On December 3, 2012, the park received the signed paper copy of the FONSI from the Regional Director, and issued a news release announcing the signed FONSI.  [R. 991.]  The project began a few days later, and Plaintiffs then filed this suit in an attempt to stop it.

The Plaintiffs initially sought a preliminary injunction attempting to enjoin the Park

Service from cutting down any trees.  The parties eventually arrived at a stipulated resolution to the preliminary injunction motion whereby the Park Service agreed to not cut down any trees within a certain portion of Cowles Bog until March 1, 2013.  [DE 35.]  The parties later agreed to extend the date until the disposition of the pending cross-motions for summary judgment. [DE 57.]

As explained above, the Plaintiffs believe that the Secretary failed to properly comply with NEPA procedures.  But because NEPA does not provide for any private right of action, Plaintiffs must bring their NEPA claim pursuant to the Administrative Procedures Act ("APA").  5 U.S.C. § 706.  The judicial review of an agency's final determination under the APA differ from those applied in a typical summary judgment proceeding.  Under the APA, "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.  Courts can only deem an agency action unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

Plaintiffs face an uphill battle in proving that the Secretary's actions were arbitrary or capricious here because challenges to federal action in the context of NEPA and the APA are subject to "a high standard."  *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995).  The burden of proof is on the Plaintiffs to demonstrate that the federal agency's decision was improper, *id*., but those decisions are "entitled to a presumption of regularity."  *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971).  Because courts must defer to the considered judgment of an agency, this makes the standard of review guiding my decision a "narrow one."  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).  The Court must

6

determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (citation omitted).

**Discussion**

In moving for summary judgment, Plaintiffs make two central arguments as to why the Park Service failed to comply with NEPA and the APA. First, they argue that the Defendants never had the authority to undertake the restoration in the first place based on the relevant statutory authority. Second, even if the Defendants did have such authority, they failed to properly follow the procedural requirements dictated by NEPA. I will consider each of these two arguments in turn.

## I. The Park Service Does Not Lack Authority for This Project

Plaintiffs' first argument is that the "Defendants lack authority for their project." [DE 52 at 5.] To my mind, this is by far the most difficult question at issue in this case, and answering it requires me to interpret the rather odd language of the enabling legislation that led to the establishment of the Indiana National Lakeshore.

In making this statutory construction, there are three subsections of the Lakeshore Act that are important for evaluating the extent of the Park Service's authority to restore Cowles Bog. First, and ultimately least important, is the opening section of the Act, which provides the following stated purpose:

> In order to preserve for the educational, inspirational, and recreational use of the public certain portions of the Indiana dunes and other areas of scenic, scientific, and historic interest and recreational value in the State of Indiana, the Secretary of the Interior is authorized to establish and administer the Indiana Dunes National Lakeshore (hereinafter referred to as the "lakeshore") in accordance with the provisions of this subchapter.

16 U.S.C. § 460u.

7

Second, and ultimately most important, is the subsection titled "Administration."  It states, in full:

> (a) **Utilization of authorities for conservation and management of natural resources**
>
> In the administration of the lakeshore the Secretary may utilize such statutory authorities relating to areas of the national park system and such statutory authority otherwise available to him for the conservation and management of natural resources as he deems appropriate to carry out the purposes of this subchapter.
>
> **(b) Preservation of lakeshore; incompatible visitor conveniences restricted; provisions for public enjoyment and understanding; developments for public uses**
>
> In order that the lakeshore shall be permanently preserved in its present state, no development or plan for the convenience of visitors shall be undertaken therein which would be incompatible with the preservation of the unique flora and fauna or the physiographic conditions now prevailing or with the preservation of such historic sites and structures as the Secretary may designate: Provided, That the Secretary may provide for the public enjoyment and understanding of the unique natural, historic, and scientific features within the lakeshore by establishing such trails, observation points, and exhibits and providing such services as he may deem desirable for such public enjoyment and understanding: Provided further, That the Secretary may develop for appropriate public uses such portions of the lakeshore as he deems especially adaptable for such uses.

16 U.S.C. § 460u-6.

Lastly, the only subsection of the Lakeshore Act that specifically addresses Cowles Bog was passed in 1976 as part of an amendment to the Act.  It states, in relevant part:

> By July 1, 1977, the Secretary shall prepare and transmit to the Committees on Interior and Insular Affairs of the United States Congress a study of areas III-A, III-C, and II-A, as designated on map numbered 626-91007. . . . With respect to area II-A, the Secretary shall study and report concerning the following objectives: (a) preservation of the remaining dunes, wetlands, native vegetation, and animal life within the area; (b) preservation and restoration of the watersheds of Cowles Bog and its associated wetlands; . . . .

8

16 U.S.C. § 460u-18(a).

The most vexing problem of statutory interpretation here comes in reconciling subsection 6(a) with subsection 6(b).  As Defendants rightly point out, subsection 6(a) is a hugely expansive grant of authority to the Secretary:  "the Secretary may utilize such statutory authorities relating to areas of the national park system and such statutory authority otherwise available to him for the conservation and management of natural resources as he deems appropriate to carry out the purposes of this subchapter."  16 U.S.C. § 460u-6(a).  Thus, if the Secretary deems the restoration of Cowles Bog to be an appropriate way to manage the natural resources of the Indiana Dunes, under Section 6(a) he plainly has the authority to do so.

But subsection 6(b) constrains the Secretary's authority because Congress was explicit that "the lakeshore shall be permanently preserved in its present state."  16 U.S.C. § 460u-6(b).  As Plaintiffs put it:  "In clear, plain, mandatory language, Congress spoke and plainly decreed that the [Lakeshore] was to continue without fundamental change or destruction in its existing condition. . . .  Defendants' plans violate Congress's mandate to permanently preserve the property in its present state, and thus Defendants lack the authority for the project."  [DE 70 at 3.]

While subsections (a) and (b) are in some ways difficult to reconcile in a satisfactory way, the Defendants propose the more persuasive reading.  Defendants argue that "[s]ubsection 6(b) is a specific exception to the broad grant of authority in subsection (a) that limits the Secretary's discretion as to 'development or plans for the convenience of visitors.'"  [DE 69 at 6.]  I find this the most plausible way of reconciling the two subsections.  Thus, in this reading, the Secretary may generally use his broad authority under subsection (a) to manage the

Lakeshore as he "deems appropriate."  But any time he is implementing a "development or plan" that is specifically "for the convenience of visitors" – under subsection (b) – that plan must be compatible "with the preservation of the unique flora and fauna or the physiographic conditions now prevailing" such that the Lakeshore will be "permanently preserved in its present state."

While this resolution of subsections (a) and (b) is not entirely satisfactory, it is nevertheless far more persuasive than the Plaintiffs' construction of the statute.  Under Plaintiffs' theory, the phrase "permanently preserved in its present state" essentially trumps all other language.  But there are at least three problems with this reading.

First, Plaintiffs have no satisfactory explanation for how to incorporate the "for the convenience of visitors" language into the statute.  Indeed, in making their argument in their reply brief, they *literally* read it out of the statute:  as they put it, "Section 6(b) of the [Lakeshore Act] clearly states that 'no development . . . shall be undertaken therein which would be incompatible with the preservation of the unique flora and fauna or the physiographic conditions now prevailing.'"  [DE 70 at 4.]  The ellipsis inserted by Plaintiffs in that quote simply excises the "for the convenience of visitors" language.

Second, Plaintiffs have no satisfactory explanation of what to do with the broad authority given the Secretary in subsection (a).  Plaintiffs argue that rather than being "all-empowering, the precatory language of Section 6(a) express only a general desire by Congress for Defendants to manage the [Lakeshore] for conservation purposes as a predicate before Congress spelled out its specific mandates to Defendants relative to [the Lakeshore] in Section 6(b)."  [DE 70 at 5.]  But such a reading essentially renders Section 6(a) little more than meaningless fluff – as

indicated by the Plaintiffs' use of the word "precatory." [1]   Reading Section 6(a) as "precatory"

would be to essentially treat it as something of a preamble, like a "wherefore" clause in a

contract.  Indeed, a good example of such language is the very first sentence of the Lakeshore

Act: "In order to preserve for the educational, inspirational, and recreational use of the public

certain portions of the Indiana dunes and other areas of scenic, scientific, and historic interest

and recreational value in the State of Indiana, . . . ." 16 U.S.C. § 460u.  *That* is a precatory

clause.  But it seems unlikely that halfway through a comprehensive statute establishing a new

national park, in a provision dealing with administration of the park, that Congress intended

certain language to be some non-binding fluff.  And more to the point, there is absolutely no

indication as to why subsection 6(a) should be treated that way.  Indeed, if Section 6(b) were

read as Plaintiffs suggest, the Secretary would be utterly hamstrung; he could not utilize his

broad authority to conserve and manage the park's natural resources as he deems appropriate.

Such an interpretation of Section 6(b) would, in essence, write Section 6(a) out of the statute.  To

accept the Plaintiffs' interpretation of the statute means that the Secretary would have to manage

those resources in a very specific way – to preserve the entire Lakeshore in its 1966 condition as

if it were permanently frozen in time.

      Lastly, as just alluded to, Plaintiffs' reading of the statute would lead to absurd outcomes.

It cannot be that Congress intended the language "permanently preserved in its present state" to

mean that the park had to be maintained in something like a hermetically sealed geodome from

1966 on.  If that were the case, wouldn't the Secretary have to make individualized decisions as

---

[1] *Black's* defines "precatory" as words "requesting, recommending, or expressing a desire for action, but usu. in a nonbinding way."

11

to every flower, shrub, tree, etc. to ensure that the Lakeshore looks exactly as it did in 1966? That is an absurdity, of course.  The park contains over 6000 tracts of land acquired at different times between 1967 and continuing to today, as authorized by amendments to the Act passed in 1976, 1980, 1986, and 1992.  None of the amendments contain language about restoring acquired Park land to the 1966 condition. Interpreting the statute to require that the 1966 conditions be preserved on each of the more than 6000 acquired parcels would mean that the Park must ascertain the 1966 condition of every tract, regardless of when it was added to the park or acquired by NPS, and manage each piece according to that condition, instead of managing the park as a whole. This interpretation would make it impossible for Park Service to manage the Lakeshore, and it was not what Congress intended.

Plaintiffs' narrow and limiting construction, then, defies both logic and various canons of statutory construction.  *See*, *e.g.*, *Kirtsaeng v. John Wiley & Sons, Inc*., __ U.S. __, 133 S.Ct. 1351, 1379 (2013) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)); *Nixon v. Missouri Municipal League*, 541 U.S. 125, 138 (2004)  ("Court will not construe a statute in a manner that leads to absurd or futile results.") (citing *United States v. American Trucking Assns., Inc.*, 310 U.S. 534, 543 (1940)); *Johnson v. United States*, 529 U.S. 694, 707 n.9 (2000) ("Nothing is better settled, than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion.") (quoting *In re Chapman*, 166 U.S. 661, 667 (1897)).

Lastly, it should be noted that it is also clear that Congress has considered the restoration

12

of Cowles Bog as at least potentially within the authority of the Secretary.  It is true that

subsection 18 of the Lakeshore Act does not give any explicit authority to the Park Service to

restore Cowles Bog.  On the contrary, that section of the Act is entirely about Congress wanting

the Secretary of the Interior to study various objectives (including the potential restoration of

Cowles Bog) and then report back to Congress about the results of those studies.  This

subsection leaves it entirely open as to whether Congress ultimately wants to act on those studies

or not.  Nevertheless, Congress did express the restoration as an objective that should be studied,

and that fact lends some additional credence that such a project would be within the considerable

discretion granted to the Secretary in subsection 6(a).

In sum, the statute grants the Secretary wide discretion to manage the Lakeshore as he

deems appropriate, and the decision of the Park Service to undertake a restoration of Cowles Bog

was not in excess of its statutory authority.  That conclusion brings us to the next question – was

the Park Service's authority properly exerted pursuant to the APA and NEPA?

## II.  The Park Service Complied with NEPA

Plaintiffs' second argument is that the Defendants failed to comply with NEPA because

the "EA and FONSI were deficient due to inaccurate or misleading information" and, as a result,

the Defendants failed to "take a hard look at alternatives and involve the public."  [DE 52 at 7,

11.]

As already noted, my review of agency action under NEPA is governed by the APA.  *See*

*Indiana Forest Alliance, Inc. v. United States Forest Serv.*, 325 F.3d 851, 858 (7th Cir. 2003).

The APA instructs courts to set aside agency action only if it is "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  The inquiry

13

under this standard must be searching and careful, but "the ultimate standard of review is a narrow one." *Marsh*, 490 U.S. at 378 (internal quotations and citations omitted).   This narrow review means asking two questions:  "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id*.  If the agency considered "the proper factors" and made "a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." *Indiana Forest Alliance*, 325 F.3d at 859.

Moreover, in addition to the deference afforded agencies under the APA, there are NEPA-specific principles that make a challenge to agency action all the more difficult.  First off, it is well established that the requirements imposed on agencies by NEPA are essentially procedural.  That is, NEPA does not itself mandate particular results, but only imposes "procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757–58 (2004). *See also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("[I]t is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process.").

What this all means is that "NEPA merely prohibits uninformed – rather than unwise – agency action." *Id*. at 351.  If an agency's decision is based on the appropriate information and considerations, it must be upheld even it is not a decision that a judge would have made in the first instance as the decision-maker for the federal agency. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558 (1978).  So, for example, in the context of this case, reasonable people might think that cutting down 3,400 trees to establish

14

a wet-mesic prairie doesn't sound like a terrific idea.  (The neighbors certainly don't think it is.)  But in the context of NEPA, a court is prohibited from "substitut[ing] its judgment for that of the agency as to the environmental consequences of its actions."  *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21 (1976).  In fact, "[t]he only role" for a court in applying the arbitrary and capricious standard in the NEPA context "is to insure that the agency has taken a 'hard look' at environmental consequences." *Id.*

If we apply these abstract legal principle to the concrete circumstances of this case, it is clear just how difficult a burden Plaintiffs have in proving that the Defendants violated NEPA.  Essentially, all the Defendants had to do to comply with NEPA is go through the necessary process proscribed by the statute – properly prepare the EA and the FONSI – such that their ultimate decision to restore Cowles Bog amounted to a truly informed decision (*i.e.*, a hard look).  By contrast, Plaintiffs essentially have to prove that the Defendants' EA and FONSI were either prepared so heedlessly as to constitute an uninformed decision or prepared as facades to paper-over what was an already predetermined outcome.

As explained below, I find that the Plaintiffs have failed to meet their hefty burden and that the Secretary sufficiently complied with NEPA in this case.  Plaintiffs make essentially three arguments in support of their contention that the Secretary failed to comply with NEPA:  1) the restoration of Cowles Bog was a predetermined outcome; 2) the Secretary never properly considered a range of reasonable alternatives in the EA; and 3) the EA contained various inaccuracies, deficiencies, and misrepresentations.  I will consider each of these arguments in turn.

**1. The Restoration Was Not Predetermined**

First, Plaintiffs argue that the restoration was a predetermined outcome – a preordained result for which the EA and the FONSI were little more than window dressing.  But a "predetermination" argument like this in the context of NEPA rightly demands a very high standard.  As the Tenth Circuit recently explained in detail:

> A petitioner must meet a high standard to prove predetermination. We now make explicit what was implicit in our previous decisions: predetermination occurs only when an agency *irreversibly and irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, *before* the agency has completed that environmental analysis – which of course is supposed to involve an objective, good faith inquiry into the environmental consequences of the agency's proposed action. . . .  [A] stringent standard . . . must be met in order for us to conclude that an agency violated NEPA by predetermining the outcome of its environmental analysis – a conclusion that we would not and should not reach lightly. In order for us to conclude that an agency has engaged in predetermination, we must decide that the agency has *irreversibly and irretrievably* committed itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, before the agency has completed that environmental analysis. We would not hold, therefore, that predetermination was present simply because the agency's planning, or internal or external negotiations, seriously contemplated, or took into account, the possibility that a particular environmental outcome would be the result of its NEPA review of environmental effects.

*Forest Guardians v. U.S. Fish and Wildlife Service*, 611 F.3d 692, 714-715 (10th Cir. 2010) (emphasis in original).

There is no indication here that the Park Service had *"irreversibly and irretrievably"* committed itself to the restoration of Cowles Bog prior to the preparation of the EA.  Beyond idle speculation, Plaintiffs' hard evidence in this regard is its contention that Defendant Mason submitted a proposal for review that was accepted for funding in 2009, and then, based on a more complete application in August 2011, funding for the project was approved before the EA

16

was completed.  [DE 55 at 2.]  But these applications for funding were essentially just requests that certain general Park Service funds be earmarked for this project – which is far from an irreversible and irretrievable commitment.  It seems entirely reasonable for the Park Service to secure funding for a project before it starts expending money preparing an EA.  It is pointless to do an EA for a unfunded project. As the Secretary rightly explains:

> [A]pplying for NPS funding is not an irretrievable commitment of resources. There is no showing that if the EA had turned up significant consequences, the agency would not have done an EIS or decided not to go forward with the project. NPS can also withdraw funding from a project and transfer it to a different project at any time.  Logic dictates that NPS would not prepare a NEPA document until a project has been funded for several reasons, including the fact that it would be a waste of time and money to go through the NEPA process for a project that may never be funded and undertaken.

[DE 69 at 12.]

Nothing in *Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000), a case that the Plaintiffs rely heavily upon, mandates a different result.  This is because the Plaintiffs have made nowhere near the showing that was made in *Metcalf*.  In that case, the federal agencies had "(1) prepare[d] an EA, (2) decide[d] that the . . . proposal would not significantly affect the environment, and (3) issue[d] a FONSI, but . . . [only] after already having signed two agreements binding them to support the . . . proposal," which violated NEPA by making an "irreversible and irretrievable commitment of resources" prior to completing the environmental review.  *Id.* at 1142-43.  In other words, by the time the "Defendants completed the final EA ..., the die already had been cast. The 'point of commitment' to this proposal had come and gone."  *Id.* at 1144.

In this case, by contrast, simply applying for a general pool of federal funds that could be withdrawn at any moment hardly constitutes an "irreversible and irretrievable commitment of resources."  This is not a case that meets the high burden for predetermination under NEPA.

**2.  The Defendants Sufficiently Considered a Range of Reasonable Alternatives**

Second, Plaintiffs argue that the Secretary never properly considered a range of reasonable alternatives in the EA.

In preparing an EA, NEPA requires agencies to consider reasonable, feasible alternatives to the proposed action.  42 U.S.C. § 4332(2)(C)(iii) (noting that agency must consider alternatives in an EIS); 40 C.F.R. § 1508.9(b) (an EA must contain a discussion of alternatives to the proposed project); *Vermont Yankee*, 435 U.S. at 551.  Before analyzing what the Secretary did in this case, it is important to keep in mind that the goal of the project is to establish a lake plain wet-mesic prairie.  The EA analyzed three proposals to achieve this goal: (1) the preferred alternative, which retained selected trees, (2) an alternative that would have retained trees only near a historic home site in the project area, and (3) the no-action alternative which is required by 40 C.F.R. § 1502.14(d).[2]  In addition, the EA also noted two alternatives that "were considered and dismissed because they did not meet the project's purpose."  [R. 341.]

Plaintiffs believe that this consideration of alternatives is inadequate.  As they put it: "Defendants never considered a range of reasonable alternatives.  'Cut 99% of the trees' or 'cut 97% of the trees' is not presenting a range of reasonable alternatives as required by [NEPA.]." [DE 70 at 8.]  But this argument ignores the well developed caselaw addressing the reasonable alternatives requirement.  Agencies are not required to consider alternatives that would not serve

---

[2]   The "no-action alternative" is a curious one.  It is difficult to conceive how choosing the no-action alternative could *ever* achieve the goals of the project.  When questioned at oral argument, the government didn't have a good answer for when the "no-action alternative" would ever really be an option.  As best I can tell, it appears that the "no-action alternative" isn't really an alternative but is better described as a benchmark for comparing the other alternatives.  *See Hammond v. Norton*, 370 F. Supp. 2d 226, 241 (D.D.C. 2005).

the reasonable project purpose. *See, e.g., League of Wilderness Defenders–Blue MountainsPhoenix (PHX) Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1072 (9th Cir. 2012) ("[T]he EIS only needs to consider in detail alternatives that would address both of the Project's stated purposes and needs by meaningfully reducing the risk of beetle infestation and wildfire while attempting to answer the six research questions."). Here, the entire stated purpose of the project is to restore the area to a wet-mesic prairie, and because a significant tree canopy prevents such a restoration, all of the reasonable alternatives have to involve the cutting of the vast majority of trees.

Moreover, an EA must only include a "brief discussion" of reasonable alternatives. *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 915 (9th Cir. 2012) ("[W]ith an EA, an agency only is required to include a brief discussion of reasonable alternatives."). Thus, when "an agency makes an informed decision that the environmental impact will be small, a view which we are required to accord deference, a 'less extensive' search [for alternatives] is required." *Highway J*, 349 F.3d at 960 (citing *River Rd. Alliance, Inc. v. Corps of Eng'rs*, 764 F.2d 445, 452 (7th Cir. 1985)).

Given this legal framework, it is clear that fully considering three alternatives (no action, 97% cutting, and 99% cutting), as well as considering and rejecting two other alternatives, was sufficient to meet the Defendants' obligation that they consider reasonable alternatives for the restoration project. *Cf. Ctr. for Biological Diversity*, 695 F.3d at 915-16 (rejecting plaintiff's argument that agency had to consider more than the no-action and the preferred alternative in an EA); *Utah Envtl. Cong. v. Bosworth*, 439 F.3d 1184, 1195 (10th Cir. 2006) ("Given the Project's dual objectives and the agency's discretion to choose those objectives, the Forest Service

examined a reasonable range of alternatives and did not act arbitrarily when it considered only

the no-action alternative and the modified proposed action.") (internal citation omitted).

**3. The EA Does Not Have Serious Inaccuracies, Deficiencies, or Misrepresentations**

Third, Plaintiffs argue that the EA contained various inaccuracies, deficiencies, and

misrepresentations such that the Defendants' decision to restore Cowles Bog was not sufficiently

informed to meet NEPA's standards.

It is true that, under NEPA, an agency decision must be based on sound science. NEPA

requires that "[a]gencies shall insure the professional integrity including scientific integrity, of

the discussions and analyses in environmental impact statements."  40 C.F.R. § 1502.24.[3]  The

integrity of the EA would be undermined if it contains serious inaccuracies, deficiencies, or

misrepresentations.   It is also true, however, that "scientific data requires a high level of

technical expertise" and, as a result, "courts must defer to the informed discretion of the

responsible federal agencies."  *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th

Cir. 2003).  *See also N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075

(9th Cir. 2011) (in "reviewing scientific judgments and technical analyses within the agency's

expertise," the court is generally "at its most deferential").  Moreover, in conducting its review, a

Court must "take care to distinguish between claimed deficiencies . . . that are merely flyspecks

and those that are significant enough to defeat the goals of informed decisionmaking and

informed public comment."  *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 673 F.3d 518, 528 (7th Cir.

2012) (quotations omitted).

---

[3]This provision only specifically applies to an EIS, but for the sake of argument I'll
assume for now that it also applies to the preparation of an EA.  *See Earth Island Inst. v. U.S.
Forest Serv.*, 697 F.3d 1010, 1020 (9th Cir. 2012).

All of Plaintiffs' perceived deficiencies are little more than flyspecks.  For instance, the Plaintiffs are up-in-arms about the EA's references to the "Indiana Swamp Act of 1850" and to Dr. Henry Cowles (the Bog's namesake).   Here's the entirety of Plaintiffs' argument in that regard:

> The EA referenced the Indiana Swamp Act of 1850 in several places, noting that "all wetlands in Indiana were entitled to the state by the federal government," conveying the impression that the property was unsold swamp land granted to the State of Indiana by the U.S. Government in 1850. Defendants have submitted no facts to support their implication.  Defendants' EA, FONSI, and findings documents rely on inaccurate information, making those documents invalid and not a product of agency expertise.  Defendants' actions thus violate the APA, as they are arbitrary, capricious, an abuse of discretion, and not in accordance with law.
>
> Defendants' EA was also misleading in its frequent comments relating to and pictures of Dr. Henry Cowles, a prominent historical figure in the environmental movement.  The EA describes restoring the 25 acres to "conditions like those experienced by Henry Cowles and his students, with a similar viewshed and a natural landscape under natural processes."  When Cowles saw the property in 1913, there was a homesite on it, not the ecological wonderland that Defendants describe.

[DE 52 at 11-12.]

 With all due respect to the Plaintiffs, this argument is an enormous overreach.  These references are not the basis for any substantive finding in the EA.  It is ridiculous to think that the EA's general, inconsequential references to the 1850 Act or to Dr. Cowles would be of sufficient substantive importance to render the Secretary's decision arbitrary or capricious.  Calling these flyspecks is an insult to the comparative enormity of flyspecks.

At least slightly more substantive – though still entirely unavailing – are Plaintiffs' complaints with respect to the Defendants' use of the 1830 survey and Dr. Pavlovic's report.  Plaintiffs argue that the Defendants made a mistake when they relied on that survey and Pavlovic's report as evidence that Cowles Bog was a wet-mesic prairie prior to human

settlement.  More specifically, Plaintiffs believe that the Secretary "suppressed or ignored that a portion of the property was timbered with trees in 1830, thus violating NEPA's mandates concerning high quality information and accurate scientific research."  [DE 52 at 11.]  Plaintiffs' basic theory here is that if the 1830 survey shows that a portion Cowles Bog was timbered in 1830, the "restoration" of the area to a wet-mesic prairie is not a "restoration" at all.

The problem with this argument is it acts as if the 1830 survey and Pavlovic's report were the only evidence Defendants had supporting the restoration.  Moreover, Pavlovic's report recognized and accounted for the fact that some of the area in the 1830s had trees.  Defendants rightly call attention to the numerous flaws in Plaintiffs' argument, with various citations to the record:

> [The Park Service] conducted soil samples that demonstrate that the project site developed under "conditions of wet-mesic prairie with a few scattered trees." "Project site hydrology present prior to disturbances by humans would have supported saturated soils, mesic soils, and soils inundated by one to five inches of water." [The Park Service] noted specifically that "[t]he proposed restoration effort will restore two wetland types, wet prairie and sedge meadow, with a dominance of wet prairie to the project site."  Further, contrary to Plaintiffs' assertions, this conclusion is supported by the 1830 survey[:]  "The soil analysis confirmed that the 1830 land survey crew recorded accurate information concerning early 19th century vegetation present at the project site."  Dr. Pavlovic's report showed that the project is justified because the 1830 survey recorded the area as "marsh and prairie and not red maple swamp."  The 1830 survey showed that the corner area contained a few open grown oak trees, not the dense tree canopy largely dominated by maples that exists today.

[DE 54 at 7 (citations omitted).]

This is all highly persuasive, as is the Defendants' ultimate conclusion on the topic: "Plaintiffs' assumptions that land with any trees cannot be wetland or that Defendants are trying to restore this area to a different wetland type are simply not supported by the record."  [*Id.* at 7-8.]  I agree, and conclude that the Defendants had more than sufficient scientific evidence to

rationally conclude that a restoration was appropriate.  In other words, the Secretary's decision was an "informed" one.

Plaintiffs also argue that the Secretary failed to sufficiently engage the public in the decision making process.  I disagree.  Federal regulations do not clearly define how public involvement requirements might apply where, as here, an agency prepares only an EA (and FONSI) rather than an EIS.  *See Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006).  In the case of an EA, the agency is required to "involve environmental agencies, applicants, and the public" only "to the extent practicable." 40 C.F.R. § 1501.4(b).  And only in "limited circumstances" must an agency make a FONSI "available for public review . . . for 30 days" prior to agency action.  40 C.F.R.  § 1501.4(e)(2); *Pogliani v. U.S. Army Corps of Eng'rs*, 306 F.3d 1235, 1238 (2d Cir. 2002) (citing § 1501.4(e)(2) in rejecting argument that Army Corps, in issuing permit for construction of gas-fired power plant, "erred by failing to release its draft EA and FONSI for public comment prior to their issuance").  Thus, agencies have "significant discretion in determining" how they comply with NEPA's public participation regulations in preparing an EA.  *Taxpayers of Mich. Against Casinos*, 433 F.3d at 861.

The requirements for public participation were easily met here.  The Park Service held a public scoping meeting at the beginning of the EA process and a special public presentation on the EA for the Town of Dune Acres.  They led a site visit of the proposed project area for members of the public.  They circulated the EA for public comment and prepared a document responding to all the comments received.  They posted the EA, the response to comments, and the FONSI on Park Service's website.  This was more than sufficient to meet NEPA's goals for informing the public about the project.  *See Taxpayers of Mich. Against Casinos*, 433 F.3d at 861

(finding that agency met NEPA's requirements when it sought comment on draft EA and provided detailed responses to the comments it received).

Plaintiffs also raise arguments in their reply brief that the Secretary failed to account for "aesthetic concerns" in the EA [DE 70 at 8] and for the environmental impact on "an open body of water next to the 25 acres that is the subject of the EA" [DE 70 at 9].  I am highly skeptical that either of these arguments have any merit, but it doesn't matter because neither was even hinted at in their motion, and both were therefore waived.  *Griffin v. Bell*, 694 F.3d 817, 822 (7th Cir. 2012) ("[A]rguments raised for the first time in a reply brief are deemed waived.").

In sum, none of Plaintiffs' arguments persuade me that the EA was fatally deficient such that the Secretary's decision amounted to being uninformed.  On the contrary, I find that Defendants' EA adequately complied with NEPA's requirements and provided a sufficient rationale for the Park Service to undertake the Cowles Bog restoration.

Let me reiterate that NEPA only prohibits *uninformed*, not unwise, agency action. *Robertson*, 490 U.S. at 351.  Whatever Plaintiffs' view on the wisdom of the Park Service's decision, the Court cannot remotely conclude that the EA is "uninformed" as it relates to the restoration of Cowles Bog.  As such, the Park Service's preparation of the EA and its decision to issue a FONSI were neither "arbitrary" nor "capricious" under the APA.

## CONCLUSION

Accordingly, for the reasons detailed above, Plaintiffs' Motion for Summary Judgment [DE 51] is **DENIED** and Defendants' Motion for Summary Judgment [DE 49] is **GRANTED**. Plaintiffs' Motion to Modify Stipulation [DE 64] and Motion to Amend [DE 71] are **DENIED AS MOOT**.  The clerk shall **ENTER FINAL JUDGMENT** in favor of Defendants stating that

24

Plaintiffs are entitled to no relief.  The clerk shall treat this civil action as **TERMINATED**.

      **SO ORDERED.**

Entered: July 2, 2013.

                                       s/ Philip P. Simon
                                  PHILIP P. SIMON, CHIEF JUDGE
                                  UNITED STATES DISTRICT COURT